# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROL SWENSON, as representative of the ESTATE OF CHARLES DONATI<br><br>Plaintiff,<br><br>v.<br><br>PHILLIP YEE, MATT DONOGHUE, PAUL ZANIBONI, MARK GIBBONS, JEFFREY SMITH, RICHARD CURTIN, MEREDITH GOLDEN, JOHN OUELLETTE, and TIMOTHY KENNEY, in their individual capacities,<br><br>Defendants. | Civil Action No. 1:23-cv-10259 |

## COMPLAINT

### INTRODUCTION

1. This is a civil rights action brought by Carol Swenson as personal representative of the estate of Charles Donati, her son. At only 35 years old, Mr. Donati died of a preventable opioid overdose in the custody of the Braintree Police Department.

2. Mr. Donati was a beloved son, brother, and friend. He spent the last night of his life under the care and custody of the Braintree Police Department, alone in a jail cell, unresponsive, and struggling to breathe. Despite obvious signs that he needed urgent medical care, the officers who could have saved Mr. Donati's life failed to secure prompt medical attention.

3. The officers' conscious and unreasonable failure to provide Mr. Donati with adequate medical attention caused his death.

1

4. Plaintiff seeks damages for Mr. Donati's estate for Defendants' violation of his due process rights under the Fourteenth Amendment.

## JURISDICTION

5. This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the U.S. Constitution. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.

## PARTIES

6. Plaintiff Carol Swenson is Charles Donati's mother and next of kin. She was duly appointed as personal representative of the estate of Charles Donati following his death.

7. Defendant Phillip Yee was at all relevant times a police officer employed by the Braintree Police Department. He is sued in his individual capacity for actions taken under the color of law.

8. Defendant Matt Donoghue was at all relevant times a police officer employed by the Braintree Police Department. He is sued in his individual capacity for actions taken under the color of law.

9. Defendant Paul Zaniboni was at all relevant times a police officer employed by the Braintree Police Department. He is sued in his individual capacity for actions taken under the color of law.

10. Defendant Mark Gibbons was at all relevant times a police officer employed by the Braintree Police Department. He is sued in his individual capacity for actions taken under the color of law.

11. Defendant Jeffrey Smith was at all relevant times a police officer employed by the Braintree Police Department. He is sued in his individual capacity for actions taken under the color of law.

12. Defendant Richard Curtin was at all relevant times a police officer employed by the Braintree Police Department. He is sued in his individual capacity for actions taken under the color of law.

13. Defendant Meredith Golden was at all relevant times a police officer employed by the Braintree Police Department. She is sued in her individual capacity for actions taken under the color of law.

14. Defendant John Ouellette was at all relevant times a police officer employed by the Braintree Police Department. He is sued in his individual capacity for actions taken under the color of law.

15. Defendant Timothy Kenney was at all relevant times a police officer employed by the Braintree Police Department. He is sued in his individual capacity for actions taken under the color of law.

**FACTS**

16. On January 28, 2020, Charles Donati experienced a mental health emergency. Because he presented a risk of suicide or self-harm, Mr. Donati was hospitalized and evaluated pursuant to Massachusetts General Laws ch. 123, §12 at South Shore Hospital in Weymouth, MA.

17. On the evening of January 29, 2020, a restraining order pursuant to M.G.L. ch. 209A was served on Mr. Donati during his hospitalization.

18. On January 30, 2020, Mr. Donati was released from South Shore Hospital.

19. On January 31, 2020, Sergeant Phillip Yee of the Braintree Police Department ("BPD") received a call alleging a violation of the above-mentioned restraining order.

20. Sergeant Yee, accompanied by Officer Paul Zaniboni and Sergeant Masesso of the BPD, contacted Mr. Donati via telephone.

21. Sergeant Yee and Officer Zaniboni were familiar with Mr. Donati from prior interactions, at least some of which involved substance use.

22. The above-named officers informed Mr. Donati of the alleged restraining order violation and that an arrest warrant would issue if he did not turn himself in.

23. Mr. Donati, who was unaware of the restraining order, became increasingly confused and distraught throughout the telephone conversation.

24. Mr. Donati sought help communicating with officers from his mother, Carol Swenson, who was present for the remainder of the telephone call.

25. Ms. Swenson explained to the officers that the restraining order in question had been served on Mr. Donati just two days prior, while he was involuntarily hospitalized at South Shore Hospital for mental health reasons.

26. After a series of conversations between Mr. Donati, Ms. Swenson, and the three BPD officers, Mr. Donati agreed to turn himself in to BPD that evening.

27. Mr. Donati, accompanied by Ms. Swenson, reported to BPD shortly after 9:00 PM.

28. Upon arrival, Sgt. Yee presented Mr. Donati with a copy of the ch. 209A order and a police department log confirming the order was served upon Mr. Donati while he was hospitalized at South Shore Hospital.

29. Sergeant Yee informed Mr. Donati that he would be arrested, booked, and held in custody. From this point forward, Mr. Donati was unquestionably under the care, custody, and control of BPD.

30. Mr. Donati began exhibiting signs of growing anxiety, and asked to step outside the station to smoke a cigarette.

31. At 9:25 PM, Mr. Donati was permitted to exit the station alone, in direct violation of BPD policy, where he smoked a cigarette and returned to his vehicle unattended.

32. Mr. Donati was left alone outside for over one and a half minutes before Sgt. Yee and Ms. Swenson joined him.

33. Mr. Donati became increasingly distraught as the parties conversed in the parking lot and requested permission to retrieve prescription medications from his vehicle.

34. At 9:32 PM, Mr. Donati was permitted to search through his vehicle while Sgt. Yee conversed with Ms. Swenson nearby. At times, Sgt. Yee directly assisted Mr. Donati with his search.

35. Mr. Donati was permitted to proceed with this search, loosely supervised, for five minutes. After recovering a number of prescription drug bottles, all three parties returned inside BPD station.

36. Almost immediately thereafter, Mr. Donati and Ms. Swenson were again permitted to return to the parking lot and to Mr. Donati's vehicle unattended to recover additional medications.

37. One minute later, Sergeant Yee joined them.

38. Under Sergeant Yee's watch, and again in clear violation of BPD Policy, Mr. Donati was permitted to take medication in a manner inconsistent with his prescriber's directions.

39. As Sergeant Yee reported, Mr. Donati stated, "oh that's the wrong pill bottle" and then, "you know what? Screw it. I'll just take two of those" before swallowing several pills from a prescription bottle.

40. Sergeant Yee did not examine nor confirm the number of pills Mr. Donati ingested.

41. Sergeant Yee did not confirm that the pills Mr. Donati took matched the description on the prescription bottle.

42. There is no indication that Sgt. Yee made a written record of the amount or type of prescription medication Mr. Donati ingested under his direct supervision.

43. Sergeant Yee, Ms. Swenson, and Mr. Donati remained in the parking lot conversing for a period of time thereafter.

44. Mr. Donati became extremely upset during this time, pacing, shaking, and sobbing.

45. Detective John Connolly, who was also familiar with Mr. Donati from prior interactions with the BPD, joined the parties for several minutes outside of the station.

46. Ms. Swenson informed the officers that Mr. Donati had been involuntarily hospitalized in the days prior due to an elevated risk of suicide and self-harm.

47. Ms. Swenson also informed officers of Mr. Donati's ongoing substance abuse disorder, mental health issues, and extremely fragile emotional state.

48. All four parties eventually returned inside BPD station, where Mr. Donati began the booking process.

49. There is no indication that Sgt. Yee, or any other officers assisting with the booking process, adequately inquired into Mr. Donati's mental state, history of suicide or self-injurious behavior, thoughts of suicide or self-harm, or any history of drug use or abuse, in direct violation of BPD policy regarding detainees with mental illnesses.

50. Officer Matt Donoghue, who assisted Sgt. Yee with the booking procedure, processed Mr. Donati's fingerprints and conducted a brief pat down.

51. Throughout the booking process, Mr. Donati exhibited slowed, mumbled speech and excessive sweating; he compulsively wiped the sweat from his hands, brow, and hairline. Mr. Donati began using his own t-shirt before eventually requesting paper towels from officers to manage the profuse sweating.

52. Mr. Donati repeatedly rubbed his chest and complained of discomfort from the medication. He was provided with water.

53. Upon the conclusion of the booking process, Ms. Swenson was permitted in the booking room to say goodbye to Mr. Donati.

54. Sgt. Yee allowed for this contact because Mr. Donati was in a "fragile state" and Sgt. Yee felt the need to "calm him down and keep him from going to the hospital."

55. Mr. Donati became increasingly upset, tearful, and hopeless—pleading with his mother to help him with the situation.

56. Ms. Swenson told Mr. Donati she loved him, asked him to be safe, and hugged her son for the last time.

57. Before departing BPD station, Ms. Swenson again reminded officers of her son's extraordinarily delicate mental state, and urged Sgt. Yee to monitor her son closely due to his ongoing substance abuse disorder, mental illness, and propensity for self-harm.

58. Sgt. Yee reportedly assured Ms. Swenson, "We're gonna do everything we can to try to keep him safe."

59. There is no indication that Sgt. Yee communicated these concerns to other officers or made a record of Ms. Swenson's explicit concerns regarding the strong risk of harm Mr. Donati faced while in police custody.

60. Despite his direct observations of Mr. Donati, his decision to allow Mr. Donati to consume prescription drugs in an improper manner, and Ms. Swenson's repeated and explicit warnings regarding the unusually serious risk of harm her son faced in custody due to his ongoing mental health and substance abuse

issues, Sgt. Yee did not implement any obvious harm-reduction procedures to address these known risks.

61. According to BPD policy, physical cell checks on detainees shall be conducted at least every thirty minutes. In the case of detainees at risk of suicide, checks shall be conducted at fifteen-minute intervals.

62. Sgt. Yee did not order—or even suggest—that more frequent cell checks were appropriate for Mr. Donati considering his physical condition, mental state, and the information provided by his mother.

63. Officer Zaniboni completed an application for complaint and a report regarding the allegations against Mr. Donati.

64. Officer Zaniboni noted in his report that Mr. Donati had been sectioned to South Shore Hospital in the days prior.

65. Officer Donoghue provided his shift replacement, Officer Gibbons, with an oral report regarding Mr. Donati around 10:30 PM.

66. It is unclear whether Officer Donoghue reported these known risks to Mr. Donati's health and safety to Officer Gibbons.

67. Officer Gibbons, as the station officer on duty, was responsible for monitoring Mr. Donati via video surveillance and conducting physical cell checks.

68. BPD policy requires detainees to be monitored at all times.

69. All holding cells at BPD are monitored by audio/video surveillance equipment.

70. This audio/video surveillance is displayed via multiple monitors in the BPD communications center.

71. Upon information and belief, the BPD surveillance system monitoring Mr. Donati's cell was fully operable on January 31 and February 1 of 2020.

72. At the start of his shift, Officer Gibbons reported having several conversations with Mr. Donati, who could be seen pacing back and forth in his cell.

73. Officer Gibbons observed that Mr. Donati appeared to be "stressing out" and "off edge."

74. There is no indication that Officer Gibbons made a record of Mr. Donati's agitated state or reported his observations to a supervisor.

75. Officer Gibbons did not otherwise report any "red flags" regarding his observations of Mr. Donati, noting only that he appeared to use the bathroom frequently.

76. Surveillance video footage revealed that Mr. Donati could be observed placing his hands down the backside of his pants, performing a wiping motion with toilet paper, unwrapping a small item, and placing it in his mouth. He repeated this behavior in the front of his pants.

77. This pattern of conduct was repeated multiple times "for hours."

78. Mr. Donati's repetitious conduct would have been visible to officers through the surveillance video streaming into the communications center and to officers completing physical cell checks.

79. Incredibly, not a single officer responsible for completing physical checks or monitoring Mr. Donati via the station's audio/video surveillance system reported observing this behavior.

80. Soon into his shift, Officer Gibbons observed Mr. Donati to be lying flat on his back, "aggressively snoring."

81. Officer Gibbons, who acknowledged having over fourteen years of experience supervising prisoners as a corrections officer, described the snoring as "out of the ordinary."

82. Loud snoring, which results from difficulty breathing, is a common sign of opiate overdose in substance users. Any officer trained in recognizing signs of substance use or overdose would be aware of this.

83. Mr. Donati's unusual and aggressive snoring was observed by multiple officers both during physical checks and in the department's communications center via live audio/video surveillance footage.

84. There is no indication that Officer Gibbons reported Mr. Donati's abnormal and aggressive snoring to a supervisor or otherwise made a record of this noted abnormality.

85. There is no indication that Officer Gibbons attempted to rouse Mr. Donati.

86. There is no indication that Officer Gibbons otherwise tried to check on or ensure the well-being of Mr. Donati.

87. Officer Gibbons ended his shift around 5:15 AM on February 1, 2020, and Lieutenant Smith assumed cell check responsibilities.

88. Lt. Smith reported conducting one cell check at 5:30 AM.

89. Officer Timothy Kenney began his shift at 6:30 AM, and reported conducting cell checks every thirty minutes thereafter.

90. Around 9:00 AM, Officer John Ouellette attempted to deliver breakfast to Mr. Donati.

91. At the time, Mr. Donati was "snoring pretty good" and was unresponsive to Officer Ouellette's attempts to verbally arouse him.

92. Showing no response to stimulus or being otherwise unrousable is a sign of a significant and life-threatening emergency, particularly for substance users.

93. Rather than alert a supervisor in order to enter Mr. Donati's cell to check on him and deliver his meal, Officer Ouellette simply tossed the breakfast through the wicket at Mr. Donati's feet.

94. Officer Ouellette reported choosing this course of action rather than alerting a supervisor and making entry into Mr. Donati's cell because he didn't want to "create a headache" for his boss.

95. Officer Ouellette did nothing more to attempt to rouse Mr. Donati or otherwise ensure his well-being.

96. When Officer Ouellette returned to the control room, he stated to other officers, "Jeez, that guy's snoring. He needs a CPAP."

97. Officers in the control room responded, "oh, we'll pass that on" and listened to Mr. Donati's labored snoring over the intercom system.

98. There is no indication that any follow up regarding Mr. Donati's irregular breathing and strenuous snoring was ever conducted following Officer Ouellette's verbal report.

99. Officer Ouellette reported that he believed "a check or two" was conducted after this time.

100. Officers observed Mr. Donati making unusually loud snoring noises for hours before he stopped breathing altogether. At no point did any officer try to meaningfully check on Mr. Donati or otherwise attended to his compromised condition.

101. At approximately 11:30 AM, Officer Kenney performed a physical check at Mr. Donati's cell.

102. Upon information and belief, the prior cell check had been conducted fifty minutes prior at approximately 10:40 AM, in direct violation of BPD policy.

103. As Officer Kenney entered the hallway to the holding cells, he noticed that Mr. Donati was no longer snoring, describing the area as "too quiet."

104. Officer Kenney observed Mr. Donati from outside the holding cell door, and observed that his chest was not rising and falling.

105. Officer Kenney reported observing Mr. Donati for what "felt like 5 minutes" but was "probably a minute" throughout which time Mr. Donati's chest did not rise or fall.

106. Officer Kenney did not otherwise notice anything unusual about Mr. Donati or his cell, though he reported that "the toilet paper was next to him which was a little weird because usually it's on top of the sink" and that "someone had, uh, pointed out that his, his, his fly or pants were undone. Just, uh, they were just out of place."

107. Officer Kenney later asserted that in his two years at BPD, it was "unusual" to see a detainee with his pant fly open.

108. Officer Kenney retrieved keys from the booking room, and returned to Mr. Donati's cell.

109. Officer Kenney still had not alerted any other officers at this time.

110. Officer Kenney again attempted to verbally arouse Mr. Donati by yelling through the cell door wicket.

111. Mr. Donati remained unresponsive.

112. Officer Kenney then entered the cell, and attempted to physically arouse Mr. Donati.

113. Mr. Donati remained unresponsive.

114. At this point, Officer Kenney retreated to find help.

115. Sergeant Richard Curtin was the first officer to respond.

116. Sgt. Curtin had previously conducted a single physical check on Mr. Donati during his shift, where he observed him to be snoring.

117. Around the time Officer Kenney found Mr. Donati unresponsive, Sgt. Curtin heard a "banging" sound over the speakers connected to Mr. Donati's cell and recalled thinking, "Oh my god. He hung himself."

118. Sgt. Curtin met Officer Kenney in the booking area where they returned to Mr. Donati's cell and began to administer first aid.

119.   Sgt. Curtin and Officer Kenney began cardiopulmonary resuscitation ("CPR") efforts.

120.   Additional officers responded to the scene and oxygen was provided. An automated external defibrillator ("AED") was applied but no shock was delivered.

121.   Officer Arki, a patrol officer who assisted in the emergency efforts, noticed that Mr. Donati's "pants were unbuttoned a little bit" and that his "fly mighta been down maybe halfway."

122.   This observation prompted Officer Arki to call for NARCAN, which he was provided and subsequently administered to Mr. Donati, without response.

123.   A number of officers continued CPR efforts until EMS arrived at the station.

124.   Mr. Donati was transported to South Shore Hospital shortly thereafter, where he was revived by medical staff but remained in critical condition.

125.   Mr. Donati, having suffered multiple cardiac arrests, had to be resuscitated multiple times.

126.   Mr. Donati was placed on life support, fell into a coma, and was moved to the hospital's Intensive Care Unit.

127.   Mr. Donati was pronounced dead on February 1, 2020. The cause of death was complications of cardiac arrest due to an opioid overdose. The manner of death was described as substance abuse.

128. Given the longstanding opioid crisis in Massachusetts, any reasonable police officer would know that an individual with a known history of substance abuse disorder who is detained in police custody may be under the influence of opioids and at risk of harm from overdose.

129. The need to be alert to Mr. Donati's risk of overdose arose prior to his detention on January 31, 2020; Mr. Donati was known to the BPD, as was his history of substance abuse.

130. The risk of overdose was heightened when Sgt. Yee permitted Mr. Donati to take the wrong medication—in excess—shortly before he was booked.

131. This need was fortified by Ms. Swenson's repeated and explicit warnings to BPD officers regarding her son's history of—and ongoing struggles with—substance abuse, suicide, and self-harm.

132. Mr. Donati's fragile mental state, slowed speech, excessive sweating, and hopeless demeanor should have further put BPD officers on notice of the elevated risk of harm.

133. The aggressive and unusual snoring exhibited by Mr. Donati and observed by multiple BPD officers throughout his detention provided an obvious sign that Mr. Donati's breathing was disrupted and that he may have been overdosing and required immediate medical attention.

134. The Defendants failed to act on these obvious signs.

135. Death from opioid overdose, which often takes hours and rarely occurs immediately, can be safely reversed with emergency medical treatment,

including the use of NARCAN. Had Mr. Donati received adequate attention for his obvious medical needs at any point during which he was under the care and custody of the BPD, he would have lived.

136. As a direct and proximate result of the Defendants' conduct, Mr. Donati suffered conscious pain and suffering, and then died. His mother, Ms. Carol Swenson, as his next of kin, suffered permanent loss of his care, protection, services, assistance, companionship, comfort, guidance, counsel, and advice.

## CLAIMS

**42. U.S.C. §1983 Against Defendants
Phillip Yee, Matt Donoghue, Paul Zaniboni, Mark Gibbons, Jeffrey Smith, Richard Curtin, Meredith Golden, John Ouellette, and Timothy Kenney:
Fourteenth Amendment Violation**

137. The above paragraphs are incorporated herein.

138. The above-named defendants were aware of, or willfully blind to, Mr. Donati's serious medical need and the substantial risks of harm it posed, and acted with deliberate indifference in failing to take obvious steps to prevent this harm and to secure prompt medical attention.

139. The defendants acted unreasonably in failing to secure medical attention for Mr. Donati when it was clear he was suffering a life-threatening medical emergency.

140. The defendants' failure to act represented such a substantial departure from accepted professional judgment, practice, or standards for police officers in their position as to demonstrate that the defendants did not base their conduct on a professional judgment.

141. The defendants violated Mr. Donati's right to adequate medical care under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

142. As a direct and proximate result of the defendants' conduct, Mr. Donati and his next of kin suffered the injuries described above.

**WHEREFORE,** Plaintiffs request that this Court:

a. Award compensatory damages;

b. Award punitive damages;

c. Award reasonable attorney's fees and the costs of this action; and

d. Award any other relief that this Court deems appropriate.

## JURY DEMAND

A jury trial is hereby demanded.

RESPECTFULLY SUBMITTED

For the Plaintiff,
Date: January 31, 2023
Carol Swenson,
By her attorneys,

/s/ Gabrielle C. Mainiero
_____
John G. Swomley, BBO # 551450
Gabrielle C. Mainiero, BBO # 709429
Swomley & Tennen, LLP
50 Congress Street | Suite 600
Boston, MA 02109
P: (617) 227-9443
F: (617) 227-8059
jswomley@swomleyandtennen.com
gmainiero@swomleyandtennen.com

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing in this case.

/s/ Gabrielle C. Mainiero
Gabrielle C. Mainiero
January 31, 2023